Edd SHEPARD, Appellant,

v.

William E. ROBINSON, Treasurer of the State of Missouri, Custodian of the Second Injury Fund, Respondent.

No. 54569.

Supreme Court of Missouri,
Division No. 2.

March 9, 1970.

Gary C. Clifton, Liberty, Mo., Robert E. Stewart, Kansas City, Mo., for Edd Shepard.

John C. Danforth, Atty. Gen., Carroll J. McBride, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

HENRY I. EAGER, Special Commissioner.

This appeal arises out of a claim against the Second Injury Fund for Workmen's Compensation benefits. The claimant lost and has appealed. We shall need to state the facts in some detail. We have jurisdiction because the State Treasurer is a party.

Claimant was an automobile mechanic. He worked for White Motor Company in Kansas City for about eight or nine years; in the fall of 1963 he was first employed by Rudy Fick, Inc., the employer in the present controversy. There he worked in a large second floor room 70–80 feet long and 30–50 feet wide, as thus vaguely described. The business was located at Pershing Road and McGee Street in Kansas City. There were eight windows along one side but, according to claimant, they were usually kept closed by the painters to keep the dust out. The room was divided into "stalls" merely by painted lines, with a row down the length of the room on each side. Claimant had two stalls on the west side of the room; another mechanic had stalls on the south side of his, and painters used the stalls immediately north of his stalls. The "body" men worked on the other side of the room. Claimant testified also: that the painters were furnished respirators but that he "rarely if ever saw them put one on"; that he was furnished none; that spray painting went on every day; that the atmosphere "was heavy sometimes," and that the fumes smelled like paint; that he would at times have to walk out and stay a few minutes to get air and that he would become nauseated and faint; that the amount of painting varied; that he "made a grievance out of it with the union" about two weeks before May 4, 1964, but that the foreman then told him that if "he didn't like it" he could get out; that there was one rather small exhaust fan which had "paint corrosion" on it and that he "didn't see it run" and he did not think it would run. Cars and trucks were moved in and out of this area and, of course, the motors were running in the process of moving, if not also at times when they were being worked on. The plaintiff's testimony emphasized the paint fumes which he could smell, but not particularly the carbon monoxide which presumably he could not smell.

On May 4, 1964, claimant first installed a "West Coast" mirror on a truck, beginning about 8:00 a. m.; in the next stall to the north was a cattle truck, parts of which were being sanded and painted; he noticed that the painter was spraying that truck about 9:30, and the fumes were blowing "back in toward, directly toward, back in kind of up under my truck pretty heavy," and claimant testified that he felt nauseated and sick. At that time claimant was working on a car or truck with a damaged radiator. At about 10:00 o'clock he stepped up on a metal crate (as he had frequently done) so that he could better reach over the fender; he collapsed, and the next thing he became conscious of was his presence in St. Mary's Hospital. He was attended there for five days, and then went to his home in Ft. Scott, Kansas.

Claimant had sustained three prior compensable injuries: (1) an injury to a lumbar disc in 1958 or 1959, for which surgery was performed; he received a settlement of about $3,000; (2) an injury to his "neck," about 1961, when a differential fell on him; this also required surgery; he was paid about $2,000 and was off work for about nine months; (3) an injury to his "hand" or lower forearm incurred when a piece of metal was projected into it; this was removed but subsequent surgery was required; he was paid about $1,-500 for this. Plaintiff testified that each and all of these injuries left him somewhat incapacitated, although he returned to his regular work; the incapacities were, supposedly: an inability to do heavy lifting, a weakness in his left hand, pain upon sudden movement of his neck, and, from the third injury, a loss of the "grip" in his right hand. When heavy lifting was required plaintiff said that he got someone to

help him. Plaintiff testified: that because of these injuries he was assigned to lighter work at White Motors; that he took a regular mechanic's job at Rudy Fick's, but suffered considerable pain in doing the work.

Claimant had suffered over the years from sundry ailments in addition to his injuries, including, according to his family physician, Dr. Basham: bronchial pneumonia, sinusitis, degeneration of a lumbar disc, bursitis of a shoulder, arthritis in one hand, a blackout spell in 1961, pulmonary emphysema, a collapse in December, 1963 (at which time he was reported as having a duodenal ulcer), a gastrointestinal hemorrhage in January, 1964, with a 66% hemoglobin (about two-thirds of the normal) and sundry coughs, chills, colds and "flu." In August, 1966, claimant was diagnosed as having arteriosclerotic heart disease, but there seems to have been no specific finding of this before May 4, 1964.

The medical testimony, taken by deposition from two physicians, is rather voluminous. In view of the points made here on the evidence, it will be necessary to summarize it. Dr. James J. Basham, a general practitioner in Ft. Scott, Kansas, was claimant's family physician. He furnished much of the above statement of claimant's prior history. He saw claimant on May 16, 1964, at his home. His diagnosis was, "cerebral vascular spasm, secondary to inhalation of paint fumes * * *." Claimant then had many complaints, including pains, general weakness, sleeplessness and a certain amount of anaesthesia in the hands and wrists. The doctor administered pain killers, and continued to see him from time to time up to the time of the doctor's deposition in October, 1966. During this period claimant suffered with shortness of breath, blackout spells, severe headaches, exhaustion and arteriosclerotic heart disease. The doctor recommended that he see a neurologist, and he later did so; he stated, as his opinion, that claimant was not capable of any gainful employment and would not be in the future. As a some-

what more specific statement of the causation he testified that such "fumes" cause minute hemorrhages in the brain, thereby cutting off the blood supply and resulting in the destruction of living brain tissue and the formation of scar tissue. He found a vascular insufficiency, but had a question as to whether the cause was at least partly functional or emotional; he thought that this condition was an ischemia (obstruction of blood) though not strictly a stroke. His diagnosis was based in part upon the history given to him, and he testified that the focal brain damage occurring on May 4, 1964, was a "new occurrence" and not an "aggravation" of prior conditions.

The report of Dr. Harry S. Cohen, a physician on the staff at St. Mary's Hospital (5–26–64), was to the effect that claimant had sustained a "cerebro-vascular spasm secondary to inhalation of paint"; he had been seen in consultation with Dr. Gregory Pucci, a neurologist.

Dr. H. Richard McFarland, testified by deposition. He had examined claimant in Kansas City at the request of the employer's insurer. He specialized in neurology. He had received from claimant a history concerning his work, the paint fumes, and his sundry complaints existing since May 4, 1964. He described the episode of May 4, 1964, as a loss of consciousness "usually" caused by a lack of blood supply to the brain, with an insufficiency of the right middle cerebral artery. He noted that claimant had, from his history, probably been exposed to chronic inhalation of carbon monoxide and doubted substantial effects from the inhalation of paint fumes; going further, he discounted "completely that paint * * * had anything to do with this man's illness * * *"; he said that, on the other hand, the results of carbon monoxide exposure are well known and that it causes many of the symptoms of which claimant complained. He explained that carbon monoxide unites with the hemoglobin and obstructs the passage of oxygen to the brain, which leads to cerebral vascular insufficiency and sometimes

causes infarction in the brain. Apparently no tests for carbon monoxide poisoning had been made. He admitted the possibility of a "mild stroke" from coronary insufficiency, fatigue, emotional distress, and lack of blood supply to the brain. He gave it as his opinion, however, that one-third of claimant's disability was caused by the inhalation of carbon monoxide and that the other two-thirds came from constitutional factors such as aging, arteriosclerosis, and the prior injuries; also, that on claimant's statement of his symptoms he was unemployable, and that, solely on the objective symptoms, he was "definitely handicapped." The doctor noted: that claimant could smell the paint fumes, but not the carbon monoxide; that, in the absence of a history of fumes, a common cause of claimant's condition would have been a stroke, but of unknown origin; and that cardiovascular insufficiency with death of tissue is, in reality, a stroke.

It appears that claimant first filed a common law action for negligence against Rudy Fick, Inc., in the Circuit Court of Jackson County, and that the defendant filed a motion to dismiss for lack of jurisdiction. Apparently the Court held a hearing and evidence was presented; that evidence is not preserved in our record. The Circuit Court did make findings of fact, including these: that defendant was an employer under the Workmen's Compensation Law, that plaintiff was an employee under the law, and, more specifically, that: "Plaintiff, Edd Shepherd allegedly sustained injuries on or about May 4, 1964 by an accident arising out of his employment within the scope, meaning and definition set forth in Chapter 287, RSMo."; and that: "The alleged incidents mentioned in plaintiff's petition occurred during the course of and in the scope of plaintiff's employment by the defendant." The Court concluded as a matter of law that the plaintiff had no cause of action at common law, and that his sole remedy was under the Compensation Act, within the jurisdiction of the Workmen's Compensation Com-

mission. It, therefore, sustained the motion to dismiss (April 17, 1967) on the ground that the Court had no jurisdiction.

Thereafter claimant filed his claim (April 18, 1967) in the Division of Workmen's Compensation against the employer *and the Second Injury Fund.* In that claim he alleged the inhalation of "paint, carbon monoxide fumes and chemicals * * *," causing extensive damage. Before the hearing, claimant and the employer, Rudy Fick, Inc., settled their controversy for $8,500, of which $1,500 was to apply to the medical expense. The settlement was approved by the Referee after hearing evidence, the attorney for the Second Injury Fund being present. The record affirmatively shows that there was no admission by the Second Injury Fund of any accident, prior accidents, or disability. The claim then proceeded to trial against the Second Injury Fund only. The Referee found, aside from the necessary formalities, that: "I find and believe from all the credible evidence, that the employee, Edd Shepard, failed to prove that he sustained an accident arising out of and in the course of his employment with the employer, Rudy Fick, Incorporated, on or about May 4, 1964. * * *

"I further find that the Division of Workmen's Compensation, State of Missouri, is not bound by the findings as indicated by Claimant's Exhibit No. B, specifically as to the issue of accident; that the Circuit Court of Jackson County, State of Missouri, only has the authority to determine the issue of Jurisdiction and that any other findings by said Circuit Court are not res judicata as to the Division of Workmen's Compensation, State of Missouri; that once it is established that jurisdiction lies solely with the Division of Workmen's Compensation, only said Division of Workmen's Compensation has sole jurisdiction over all other issues between the parties.

"I further find and believe that the employee, Edd Shepard, failed to prove that

the conditions complained of were caused by and/or aggravated by said alleged accident of May 4, 1964." Upon review, the Industrial Commission adopted the Referee's findings and rulings and affirmed the award of no compensation; it further found that it was not bound by the findings or rulings of the Circuit Court in the common law action. Upon appeal, the Circuit Court affirmed the award of no compensation. This appeal followed.

Claimant, on this appeal, submits these points: (1) That the Circuit Court (in the common law action) found that there was an "accident" within the meaning of the Workmen's Compensation Law, that its action constituted a judgment *in rem,* and that it is therefore binding on the respondent; (2) that the finding of "no accident," affirmed by the trial court, was against the overwhelming weight of the evidence; and (3) that there was no competent and substantial evidence to support that award. Respondent says: (1) that the Commission was not bound by the findings of the Circuit Court in the common law action on the issue of "accident arising out of and in the course of his employment"; and (2) that the judgment of the trial court was supported by competent and substantial evidence and was not contrary to the overwhelming weight of the evidence.

We have determined that the findings of the Circuit Court in the common law action were not binding upon the Referee or the Industrial Commission upon the vital issue as to whether claimant had suffered an accident (within the meaning of our compensation statutes) arising out of and in the course of his employment. This is true for two reasons, as we view the situation. In the first place this ruling or judgment was not one in rem, as claimant insists it is, and the Second Injury Fund was not a party to that action; secondly, the Court did not actually make such a finding.

Upon the "in rem" contention claimant cites: 50 C.J.S. Judgments § 907, p. 547; Spitcaufsky v. Hatten, 353 Mo. 94, 182 S.W.2d 86, 160 A.L.R. 990; State ex rel. Gott v. Fidelity & Deposit Co. of Baltimore, Md., 317 Mo. 1078, 298 S.W. 83. The substance of the cited text is to the effect that a judgment in rem is one affecting "the status of some particular thing or subject matter," rendered by a court having jurisdiction, and acquired generally by an actual or constructive seizure of the property involved, or the court's dominion over the "status in controversy." It is common knowledge that the usual type of in rem proceeding is one affecting specific real or personal property. The Spitcaufsky case cited was one involving the Jackson County land tax collection act (the Land Trust) and the Court merely held that a tax foreclosure was an action in rem. No one would deny that. In Gott, supra, the Court held that orders of the probate court concerning specific money or property were proceedings in rem, for certain purposes, as was the order appointing an administrator.

Claimant here seeks to apply the "status" references of such authorities to the ruling of the Circuit Court in his original common law action. Even assuming, for the moment, that the Court found or held that there had been an "accident" arising out of and in the course of claimant's employment, such a finding would not be the determination of a *status,* such as is contemplated by the authorities. It would merely be a finding of fact or a conclusion of law on an ordinary issue in a law action. We have been cited to no case, and have found none, which is even remotely analogous. The "status" cases which we have found (and there are few) involve matters such as divorce or the adjudication of one as a bankrupt. Adams v. Adams, 154 Mass. 290, 28 N.E. 260, 13 L.R.A. 275; Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230.

Claimant cites the case of Lamar v. Ford Motor Co., Mo., 409 S.W.2d 100. It

merely holds, so far as we are concerned, that the Circuit Court had concurrent jurisdiction to determine whether plaintiff (in a common law action) was an employee of Ford or of the Union Local and that a dismissal of the suit on affidavits and motions to dismiss was improper. It did not determine any question of res adjudicata, but we further note that the supposed employer (Ford) was a party defendant and would have been the only interested party opposing the plaintiff in a Workmen's Compensation proceeding. In Hines v. Continental Baking Co., Mo.App., 334 S.W.2d 140, 84 A.L.R.2d 1027, and Harryman v. L & N Buick-Pontiac, Inc., Mo., 431 S.W.2d 193, the rulings held to be res adjudicata were final determinations made by the Industrial Commission in matters within its jurisdiction (the reverse of our situation), and in each case the employer-defendant was a party in both the common law action and the compensation proceeding. It is obvious that the claimant in our case, pursuing here only the Second Injury Fund which was not a party to the prior common law action, is, so far as the theory of res adjudicata is concerned, relegated to his contention that the prior findings and judgment were *in rem*. We have already ruled against that contention.

■ We have concluded further, however, that the Circuit Court did not actually make such a finding as claimant contends it did. For easy reference we quote it again, in its appropriate parts: "3. Plaintiff, Edd Shep*h*erd allegedly sustained injuries on or about May 4, 1964 by an accident arising out of his employment within the scope, meaning and definition set forth in Chapter 287, RSMo.

"4. The alleged incidents mentioned in plaintiff's petition occurred during the course of and in the scope of plaintiff's employment by the defendant."

■ Even a casual examination discloses that the Court merely was of the view that the plaintiff (claimant) had *allegedly* sustained injuries by accident coming within the scope of the Compensation Act, and that by reason of such *claim* and *allegations* the sole jurisdiction was in the Division of Workmen's Compensation. The word "allegedly" was thus used, as was also the word "alleged" in paragraph 4. We do not regard the insertion of the word "an" in the second line of paragraph 3 as changing this obvious intent and meaning. We do not need to decide whether, under Lamar, supra, the Court should have determined in fact whether there *was* such a statutory accident. There was no appeal from the ruling. There are marked distinctions between this case and the Lamar case. We merely hold that the Circuit Court *made* no such finding, and that there is nothing in its findings or order which could thus be res adjudicata. We note also that this order did not pretend to be an adjudication on the merits, but merely a holding of lack of jurisdiction. And, generally, a court must have jurisdiction in order to render a judgment in rem. 50 C.J.S. Judgments § 908, p. 548.

We now reach the evidentiary phases of the litigation. The principles governing appeals in such matters as this are so well settled that we need not repeat them. The Referee (and the Commission) found that the claimant had "failed to prove that he sustained an accident arising out of and in the course of his employment * * *"; and that he had "failed to prove that the conditions complained of were caused and/or aggravated by said alleged accident of May 4, 1964." We need not consider the rulings concerning the effect of the prior order and judgment of the Circuit Court. In view of the negative findings made on accident and causation, the Referee made no attempt to find the factual bases for any liability of the Second Injury Fund under § 287.220, which, of course, would have required findings of the extent of any disability caused by the occurrence of May 4, 1964, as well as the extent of any pre-existing disability.

We consider first the finding of the failure to prove an accident arising out of and in the course of the employment. It has been held in Missouri that the breathing of noxious fumes may constitute an accident within the meaning of the Compensation Law. McKay v. Delico Meat Products Co., 351 Mo. 876, 174 S.W.2d 149; Vogt v. Ford Motor Co., Mo.App., 138 S.W.2d 684. See, however, the caution noted as to such cases in Staples v. A. P. Green Fire Brick Co., Mo., Banc, 307 S.W.2d 457. We shall assume that the occurrences of May 4, 1964, *could* have constituted such an accident if that theory was sufficiently supported by the evidence. The Referee and the Commission found that the claimant failed to prove such.

The Referee and the Commission are the designated finders of the facts; it is only under exceptional circumstances that we may reverse an award on the facts. The credibility of witnesses is a function of the Referee and Commission. Snowbarger v. M. F. A. Central Co-op., Mo., Banc, 349 S.W.2d 224; Jacobs v. Bob Eldridge Construction Co., Mo.App., 393 S.W.2d 33; Ginter v. Freund Baking Co., Mo.App., 388 S.W.2d 505. The principal difficulties which encounter the claimant here are: (1) that there was no affirmative substantial evidence of exhaust fumes or the presence of carbon monoxide in dangerous concentration on May 4, 1964, or indeed prior thereto; there was probably an inference that there frequently were exhaust fumes present, but the concentration and danger remained unknown; and (2) the opinions of the two doctors (both of whom, by deposition, were offered on behalf of the claimant) were wholly inconsistent as to the cause of claimant's collapse on May 4, 1964, and his subsequent condition. Dr. Basham testified that he was totally disabled and his testimony may fairly be considered as stating the opinion that his collapse and subsequent condition were caused by paint fumes. A brief entry in the St. Mary's record was to the same general effect. Dr. McFarland, also claim-

ant's witness, gave as his opinion that one-third of claimant's condition (in 1967) had been caused by carbon monoxide, and the other two-thirds by constitutional conditions and ills, plus his previous injuries. Dr. McFarland specifically eliminated the inhalation of paint fumes as a cause. It seems obvious that the Referee, in this situation, determined that he could rely on *neither*. There is substantial and competent evidence in Dr. McFarland's testimony to support the Referee's disbelief of the *paint* theory. There is a lack of substantial and competent evidence in the record to show the presence of carbon monoxide in such concentration and quantities as would support an opinion of causation based upon *that*. While claimant did testify that cars and trucks were driven in and out, and that if the motors ran very long they fouled up the air, his major emphasis was on paint fumes. Indeed his only complaint of the situation on the morning of May 4, 1964, was the paint fumes. There is no medical testimony to indicate that the ill effects of carbon monoxide would be cumulative. Dr. McFarland apparently assumed a dangerous concentration of carbon monoxide on May 4, 1964, from the hypothetical question asked him. The Referee and the Commission had the right to believe and find that the evidence of plaintiff (and his was the only evidence) did not justify any such assumption, as apparently they did. There was no evidence that anyone else had suffered any ill effects. And we note further that at one point Dr. Basham testified that claimant's "major problem may well be functional," which, as we understand his testimony, was the equivalent of "emotional disturbance." He contrasted this with real "vascular ischemia" or a physically caused impairment of the blood supply.

The Referee and the Commission, having thus a substantial basis for disbelieving the occurrence of an accident resulting from either paint fumes or carbon monoxide, apparently decided that claimant's collapse arose from natural causes, as Dr. McFarland indicated it well might have done.

He thus testified that, absent the fumes, the "most likely thing would be that he had a syncopal event of unknown etiology of which one common cause would be a stroke." Claimant had a long history of illness and injuries. We are unable to say that the award of no compensation was made without the support of substantial and competent evidence. For the same reasons, and particularly in view of the glaring inconsistencies in the medical testimony, we cannot say that the award was contrary to the overwhelming weight of the evidence.

No issue remains as to the extent of claimant's disability; in fact, there was none before the Commission after the adoption of its other findings. The judgment of the Circuit Court is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.